745 A.2d 509

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. STEVEN R. FORTIN, DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued September 28, 1999—Decided February 23, 2000.

518

*Matthew Astore*, Deputy Public Defender II, argued the cause for appellant and cross-respondent (*Ivelisse Torres*, Public Defender, attorney; *Mr. Astore, Anderson D. Harkov*, Assistant Deputy Public Defender and *Robert A. Obler*, Designated Counsel, of counsel and on the briefs).

*Nicholas Ruggiero* and *Thomas J. Kapsak*, Assistant Prosecutors, argued the cause for respondent and cross-appellant (*Glenn Berman*, Middlesex County Prosecutor, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This is a capital murder case. The State has charged the defendant with killing a woman in a savage sexual assault. There are two issues in this interlocutory appeal. The first issue is whether the Law Division erred in ruling that the prosecution could introduce evidence of a similar crime in Maine on the issue of identity under *N.J.R.E.* 404(b). The State offered the evidence to show similarities between an incident in which defendant sexually assaulted and strangled a state trooper in Maine and the sexual assault and murder for which he is charged in New Jersey. The second issue concerns whether the State's proposed expert witness, Robert R. Hazelwood, can be qualified as an expert on the ritualistic and signature aspects of crime under *N.J.R.E.* 702, and whether he can testify through the use of "linkage analysis" that the same person who committed the Maine crime committed the murder in New Jersey.

## I.

On August 11, 1994, Melissa Padilla was murdered in the Avenel section of Woodbridge Township. Her boyfriend found her body lying half inside a large-diameter concrete sewer or drainage pipe

along the roadway. Padilla's body was naked from the waist down. She was wearing a shirt, but no bra. Bags of food, a partially eaten sandwich, a store receipt, an earring, debris including cigarette butts, and a bloody one-dollar bill were found scattered near the body. Padilla's shorts, with her underwear still inside them, were found on a nearby shrub.

Inside the concrete pipe was a large blood stain. The assailant had brutally beaten Padilla about her face and head. Her face was swollen and bruised, and her nose was broken. She had been killed by manual strangulation. The autopsy revealed rectal tearing, and bite marks on Padilla's left breast, left nipple, and the left side of her chin.

On April 3, 1995, Maine State Trooper Vicki Gardner came upon a vehicle stopped on the shoulder of a road. She stopped to question and assist the driver. Defendant Steven Fortin, the occupant of the vehicle, told her that he was having mechanical trouble. After noticing the smell of alcohol, Gardner administered a series of sobriety tests. She summoned another trooper by radio to complete the testing and paperwork associated with the stop. As she was sealing the results of one of the sobriety tests, defendant grabbed her by the throat and strangled her until she almost lost consciousness. Gardner later said that she realized at one point that her pants and underpants had been removed and that Fortin was sexually assaulting her. As the back-up drew near, defendant sped away with Gardner in the car. As he drove, Fortin cursed and punched her in the face. Gardner tried to jump out of the moving car. However, she did not roll free of the car and was dragged along the pavement for a short time before she was freed from the vehicle. Farther down the highway, defendant lost control of the car, turned it over and fled from the scene on foot. He was later apprehended at a rest area about a mile from the accident.

Gardner's face had been severely beaten and her nose was broken. She had been manually strangled. In addition, she had been bitten on the left chin, left nipple, and left breast, and she

suffered injuries from vaginal and anal penetration. Gardner's pants, underpants, and bra had been removed. When her nylon running pants were found in her patrol car, her underpants were still inside them.

Maine State Police contacted officers in New Jersey to inform them of the charges pending against Fortin. During the New Jersey investigation, the police learned that Fortin had lived in Avenel at the time of the Padilla murder. Moreover, they learned that Fortin had argued, fought, and separated from his girlfriend earlier on the evening of the murder. When later seen by his girlfriend, he had scratches on his head, neck, and chest. Police employed a dentist to examine dental models and wax bites of defendant and the bite marks on Padilla. He concluded that the bite marks on Padilla's breast had been caused by defendant, but that the remaining bite marks "could" have been caused by defendant.

At a pre-trial hearing under Evidence Rule 104, the State sought to establish a foundation to introduce at trial a report and testimony of Robert R. Hazelwood, as an expert in the analysis of *modus operandi* (a criminal's customary manner of operation referred to as an "M.O.") and ritualistic crimes. Hazelwood had served in the military police for eleven years before becoming an F.B.I. agent. During his last sixteen years of FBI service, he had worked in its Behavioral Science Unit, conducting research into the motivations and characteristics of the perpetrators of violent crimes, supervising the training of other officers in the unit's methodology, and consulting with law enforcement agencies around the country on unsolved crimes. In all, Hazelwood had personally investigated over 7000 crimes in his 35 years in law enforcement. At the time of the trial, he was employed by the Academy Group, an association of retired FBI and secret service agents who formerly worked for the Behavioral Science Unit. Defense counsel objected to any evidence related to defendant's plea bargain in Maine or Hazelwood's proposed testimony.

Based on Hazelwood's review of the Maine and New Jersey crimes, he first determined that the *modus operandi* of the crimes demonstrated fifteen aspects that were consistent in the Padilla and Gardner attacks: (1) both crimes were "high risk" (2) committed impulsively (3) against female victims (4) who were both fully mature in age; (5) both crimes were committed against victims who crossed the offender's path; (6) both victims were alone when attacked; (7) both assaults took place adjacent to or on well-traveled roadways; (8) both occurred during darkness; (9) no weapons were used during the assault; (10) both victim's sustained only blunt force injuries; (11) both assaults took place at the point of confrontation; (12) both victims sustained trauma primarily to the upper face with no damage to teeth; (13) both victims had their lower garments completely removed; (14) both victims were wearing shirts, but their breasts were free; (15) neither victim had seminal fluid on or in her body. In Hazelwood's report, as further explained at the Rule 104 hearing, he noted that *modus operandi* is learned behavior which can change as a criminal learns, modifies and adapts his behavior to fit a particular situation. An example is a serial rapist who always cuts windows with a glass cutter. A criminal changes his *modus operandi* to achieve three goals: (1) succeed at the crime; (2) protect his identity; and (3) facilitate his escape.[1] He concluded that in his experience, he had never seen the cluster of M.O. characteristics exhibited in the Padilla and Gardner attacks in any other crime. In addition, both victims' noses were broken and their underpants were found intertangled with their outer pants. Hazelwood then described the "ritualistic" aspects of the crimes, *i.e.*, the way in which the perpetrator seeks sexual gratification. Unlike *modus operandi*, "ritual" aspects of a crime do not change and are linked to the criminal's need to do certain things. These actions are often unnecessary to the commission of the crime, but serve to complement the underlying motivation or fantasy of the

---

[1] Defense counsel wryly observed that Fortin must have been a slow learner, having followed the same M.O. after his victim had already called for back-up.

offender in sexual crimes. He identified five behaviors common to these two crimes: (1) bites to the lower chin; (2) bites to the lateral left breast; (3) injurious anal penetration; (4) brutal facial beating; and (5) manual (frontal) strangulation. Again, he testified that he had never before seen that precise combination of ritual behaviors. Using "linkage analysis," Hazelwood determined that the likelihood of different offenders committing two such extremely unique crimes was highly improbable. He explained that linkage analysis is the procedure used by criminal investigators when the concentration of M.O. and ritualistic characteristics in crimes is high, such that the investigator can conclude that the perpetrator is the same person.

On June 3, 1998, the Law Division made two rulings: one on the admissibility of the *N.J.R.E.* 404(b) other-crimes evidence and the other on the admissibility of Hazelwood's testimony under *N.J.R.E.* 702, generally governing the admission of expert opinions. In each instance, the court set forth its rulings in a comprehensive, written opinion. On the first issue, applying the standards of *State v. Cofield*, 127 *N.J.* 328, 605 *A.2d* 230 (1992), and *State v. Stevens*, 115 *N.J.* 289, 558 *A.2d* 833 (1989), the court held that the evidence of the crime against Trooper Gardner in Maine was admissible in the case against Fortin in New Jersey. The evidence was similar in kind and reasonably close in time to the offense charged; evidence that Fortin committed the Maine crime was clear and convincing and relevant to the issue of identity; the proof of identity was inadequately served by the bite mark and cigarette butt evidence identifying defendant as the perpetrator of the New Jersey crime; and the probative value of the other-crimes evidence outweighed its probable prejudice. The court concluded that the other-crimes evidence was admissible, but subject to exclusion of Fortin's guilty plea in Maine.

The Law Division applied *State v. Kelly*, 97 *N.J.* 178, 478 *A.2d* 364 (1984), to evaluate the admissibility of Hazelwood's testimony as an expert. The court found that the analysis of *modus operandi* in homicide cases, and certainly the analysis of ritualistic

behavior, involved something far beyond the knowledge, experience, or ability of the average fact-finder. In addition, the court found that the theory of Hazelwood's testimony is sufficiently relied on in the law enforcement and criminal investigation community, *i.e.*, the community in which the theory has applicability. Finally, the court held that Hazelwood had sufficient expertise to offer the intended testimony, and therefore qualified him as an expert on the *modus operandi* and ritualistic behavior of violent crime offenders.

On interlocutory appeal, the Appellate Division affirmed the 404(b) ruling, but reversed the admission of Hazelwood's testimony. *State v. Fortin,* 318 *N.J.Super.* 577, 724 *A.*2d 818 (1999). It held that there had been neither "clear error of judgment" nor a "manifest denial of justice" as required in *State v. Marrero,* 148 *N.J.* 469, 691 *A.*2d 293 (1997), for reversal of the 404(b) ruling by an appellate court. 318 *N.J.Super.* at 594–95, 724 *A.*2d 818. The Appellate Division found that the less prejudicial evidence available to prove identity was relatively weak and might not be deemed persuasive by a jury. *Id.* at 596–97, 724 *A.*2d 818. The panel agreed that the prejudice inherent in the other-crimes evidence had to be minimized by "sanitizing" that evidence, that is, by limiting the admissible facts to those necessary to prove identity. *Id.* at 598, 724 *A.*2d 818. The court suggested that the defense and prosecution should try to select those aspects of the Maine incident that were essential to the State's identity evidence and capable of presentation without sacrificing defendant's right to a fair trial. The court stated that if the parties could not reach an agreement, the trial court would hold another Rule 104 hearing to determine the scope of the material to be admitted. *Id.* at 598–99, 724 *A.*2d 818.

On the question of Hazelwood's testimony, the Appellate Division found that the analysis was not sufficiently reliable to be admitted as expert evidence. *Id.* at 609, 724 *A.*2d 818. The panel stated: "We are simply not convinced the State has satisfied its burden to establish that 'the field testified to [is] at a state of art

such that an expert's testimony could be sufficiently reliable[.]' "
*Id.* at 610, 724 *A*.2d 818 (quoting *Kelly, supra,* 97 *N.J.* at 208, 478
*A*.2d 364). The Appellate Division observed that Hazelwood's
testimony was essentially "ultimate issue" evidence. If defendant
committed the Maine crime and the same person committed the
Maine and New Jersey crimes, then Hazelwood's testimony was
nothing more than an "expert" opinion that Fortin had committed
the New Jersey crime. *Id.* at 600–01, 724 *A*.2d 818. Although
Hazelwood claimed that his analysis was based on training and
experience (as when a police officer testifies that a suspect ap-
peared drunk or a particular package of drugs demonstrated a
suspect's intent to distribute them), the Appellate Division rea-
soned that his analysis actually involved an application of behav-
ioral science (recall that Hazelwood's F.B.I. unit was called the
Behavioral Science Unit). *Id.* at 600, 724 *A*.2d 818. As such, the
panel ruled that his testimony should be evaluated under the test
for admission of scientific evidence. *Ibid.* Using that test, the
court concluded that dissimilarities in the cases and the small
sample size (two crimes) distinguished this evidence from similar
evidence admitted by other jurisdictions. *Id.* at 608–09, 724 *A*.2d
818.

Defendant's motion for leave to appeal sought review of the
Appellate Division's holding that evidence of Fortin's involvement
in the Maine assault was admissible. The State sought review of
the holding that Hazelwood's expert report and testimony was
inadmissible. We granted both motions. 160 *N.J.* 86, 733 *A*.2d
492 (1999).

## II.

■ For the reasons stated in its opinion, we agree with the
judgment of the Appellate Division that the proposed expert
testimony of Hazelwood concerning linkage analysis lacks suffi-
cient scientific reliability to establish that the same perpetrator
committed the Maine and New Jersey crimes. We add only these
observations.

The linkage analysis evidence is similar to the rapist profile evidence that we considered inadmissible in *State v. Cavallo,* 88 *N.J.* 508, 443 *A.*2d 1020 (1982). In that case, two defendants were convicted of rape, abduction, and private lewdness. At trial, the defendants sought to introduce a psychiatrist's testimony that one defendant did not have the psychological traits of a rapist. We considered how a proponent of scientific evidence that an accused lacks the personality profile of a rapist can establish "general acceptance" of such a theory and thereby its reliability. *Id.* at 521, 443 *A.*2d 1020. Using the three methods of proof generally recognized by courts, *i.e.,* (1) expert testimony, (2) scientific and legal writings, and (3) judicial opinions, we held that the defendants failed to meet their burden of showing that the scientific community generally accepts the existence of identifiable traits common to rapists. *Ibid.* In addition, we held that defendants failed to demonstrate that psychiatrists possess any special ability to determine whether an individual is likely to be a rapist. Thus, we deemed the evidence to be inadmissible.

Hazelwood's report similarly fails to meet the standards for the admission of testimony that relates to scientific knowledge. Although Hazelwood possesses sufficient expertise in his field and his intended testimony is beyond the ken of the average juror, the field of linkage analysis is not at a "state of the art" such that his testimony could be sufficiently reliable. *See Kelly, supra,* 97 *N.J.* at 197, 478 *A.*2d 364 (holding three requirements for the admission of expert testimony: (1) the intended testimony must concern a subject that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; (3) the witness must have sufficient expertise to offer the intended testimony). In this case, we are concerned with the second prong of the test, the scientific reliability of the evidence. *See State v. Harvey,* 151 *N.J.* 117, 699 *A.*2d 596 (1997)(discussing proper use of expert testimony, scientific literature, and judicial opinions to determine general acceptance of results of DNA analysis from polymarker dioxyribonucleic acid testing and dot-intensity analysis). In a work that he co-

authored, Hazelwood is quoted as saying that a sexual predator's behavior is as unique as his fingerprints, his DNA, or as a snowflake. Stephen G. Michaud and Robert R. Hazelwood, *The Evil that Men Do*, 177–78 (1998). As the Appellate Division noted however, the authorities and literature authored by Hazelwood and others do not demonstrate that linkage analysis has attained such a state of the art as to have the scientific reliability of DNA testing.

Although, as Hazelwood explained, "linkage analysis" is distinct from profiling, the history of success in profiling serial killers is uneven. For example, psychological profiling in the Atlanta Child Murders case matched the defendant Wayne Williams, even though he was never convicted of killing a child. The deaths for which he was ultimately convicted were those of two victims in their twenties. *Id.* at 95. On the other hand, psychiatrists and psychologists were off-target in their profile of the suspects in the "Boston Strangler" case of the 1960s [2].

Moreover, linkage analysis is a field in which only Hazelwood and a few of his close associates are involved. Concerning consensus on acceptance of "linkage analysis" in the scientific community, the other experts mentioned by Hazelwood in his testimony were either current or former co-workers. In this respect, there are no peers to test his theories and no way in which to duplicate his results [3]. *See Windmere, Inc. v. International Ins. Co.*, 105

---

[2] "The psychiatrists predicted that the Boston Strangler was actually two people, each of whom lived alone. One of them was a homosexual. In fact, when Albert DeSalvo confessed to the killings, it was determined that two people were not involved and that DeSalvo lived with his wife and kids." *See* Alan W. Scheflin, *David V. Canter and Laurence J. Alison's Criminal Detection and the Psychology of Crime*, 38 *Santa Clara L.Rev.* 1293, 1297 n. 15 (1998) (book review).

[3] For the reasons noted by the Appellate Division, we also believe that the cases in other jurisdictions in which similar evidence has been admitted are distinguishable. In *Pennell v. State*, 602 A.2d 48 (Del.Supr.1991), the Supreme Court of Delaware permitted an expert to review the three murders of which defendant was charged and express the opinion that they were all committed by

*N.J.* 373, 522 *A.2d* 405 (1987) (holding that testimony of two experts, who had limited experience and were both affiliated with development of voiceprint device at principal source, did not establish general acceptance so as to require admission of results of voiceprint analysis into evidence, particularly where one expert conceded that device lacked scientific consensus).

## III.

In all fairness, Hazelwood did not purport to cloak his testimony with a mantra of scientific reliability. He candidly acknowledged that linkage analysis is not a science, but rather is based on years of training, education, research, and experience in working on thousands of violent crimes over an extended period of time. Such methods have great value for purposes of criminal investigation. We therefore believe that one such as Hazelwood has a proper role in a criminal trial based on his experience as an expert in criminal investigative techniques. Such a witness is qualified to discuss similarities between crimes without drawing conclusions about the guilt or innocence of the defendant. Within that ambit, his testimony can be of assistance to the court and perhaps a jury on the issue of admission of other-crime evidence. Of course, Hazelwood would not be permitted to testify on the

---

the same person. In that case, there was overwhelming commonality, linking all three murders: (1) all three victims were female prostitutes and all had similar injuries; (2) two had identical causes of death; (3) defendant drove a distinctive blue van with rounded headlights and no side windows that had been seen in the area of the murders; (4) a search of the blue van yielded fibers matching those of one victim; duct tape similar to that found in the hair of another victim; a blood stain; and pliers consistent with bruises found on one victim. In *State v.Code*, 627 *So.*2d 1373 (La.1993), *cert. denied*, 511 *U.S.* 1100, 114 *S.Ct.* 1870, ·128 *L.Ed.*2d 491 (1994), the Supreme Court of Louisiana upheld a conviction of four of eight murders of which defendant was charged. In each of the eight murders, there were overwhelming similarities including the following: matching latent fingerprints, similar electrical cord and duct tape, use of a unique handcuff ligature, distinctive knots, the victims were stabbed or strangled multiple times, and the coroner's reports and testimony identified the various signature elements of the murders. Thus, the court allowed an expert to testify for the State that these similarities demonstrated "signature crimes" of the defendant.

ultimate issue of whether the person that assaulted Trooper Gardner is the same person that murdered Melissa Padilla.

## IV.

In New Jersey, we accept the common-law rule that evidence of another crime may be relevant to prove identity. *N.J.R.E.* 404(b) reads:

Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, *identity* or absence of mistake or accident when such matters are relevant to a material issue in dispute.

[emphasis added].

In *State v. Cofield, supra,* we formulated "a rule of general application in order to avoid the over-use of extrinsic evidence of other crimes or wrongs." 127 *N.J.* at 338, 605 *A.*2d 230. For other-crimes evidence to be admissible, we stated that it must possess the following characteristics:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*Id.* at 338, 605 *A.*2d 230 (citations omitted.)]

Evidence of prior bad acts must be relevant not merely to a material issue, but to a material issue that is genuinely disputed. *Ibid.* (citing *State v. Stevens,* 115 *N.J.* 289, 558 *A.*2d 833 (1989)).

In cases concerning "signature" crimes, we stated:

Evidence Rule 55 [the predecessor to *N.J.R.E.* 404(b) ] is most easily understood in situations of signature crimes, in which some distinct feature about the two crimes clearly allows the jury to make an inference other than propensity to commit crime. For example, the distinctive features of a silver pistol used in a prior crime would be admissible under Evidence Rule 55 in an unrelated murder trial to establish either the identity of the perpetrator or the weapon used.

[*Id.* at 336, 605 *A.*2d 230 (citing *State v. Long,* 119 *N.J.* 439, 575 *A.*2d 435, (1990)).]

In *State v. Reldan*, 185 *N.J.Super.* 494, 449 *A.*2d 1317 (1982), the Appellate Division found that evidence of defendant's commission of two prior, allegedly similar offenses, a rape and assault by "use of force to throat," was an improper use of other-crimes evidence to establish identity. In that case, the defendant was on trial for the rapes and murders of two women by ligature strangulation. The defendant had previously been convicted of a rape of one B.C. and an attempted robbery of B.M. In those assaults, Reldan had used his arm to press against B.C.'s neck, and he used a knife and his hand to muzzle and choke B.M. during the robbery. According to the trial court,

> never has this court heard or seen strangulation or the use of force applied to the throat as a means of obtaining submission of a potential rape victim ... indeed the use of force to the throat of a person is rare in any type of crime. Because of that, it is concluded that such method is unique and tantamount to a signature, so that it qualified under the exception in Rule 55 as probative of the issue of identity only.
>
> [*Id.* at 500–01, 449 *A.*2d 1317.]

The Appellate Division disagreed, holding that a greater degree of similarity between the charged crime and the uncharged crime is needed when the evidence of the other crime is introduced to prove identity than when it is introduced to prove state of mind. (citing E. Cleary, *McCormick on Evidence* § 170, p. 452 (rev. ed.1972)). The Appellate Division agreed that had the other crimes been accomplished by the use of a "garrote or ligature," the other crimes might have borne a like signature. The court held:

> In order for evidence of a prior crime to be admissible on the issue of identity (for which it was offered here) the prior criminal activity with which defendant is identified must be so nearly identical in method as to earmark the crime as defendant's handiwork. The conduct in question must be unusual and distinctive so as to be like a signature, and there must be proof of sufficient facts in both crimes to establish an unusual pattern.
>
> [*Id.* at 502–03, 449 *A.*2d 1317. (citing *State v. Sempsey*, 141 *N.J.Super.* 317, 323, 358 *A.*2d 212 (1976)) ].

Thus, in order to be admissible on the issue of identity, the other crimes must bear peculiar, unique, or bizarre similarities. In *Reldan*, the panel concluded:

The common factor relied on was an assumption by the court that rape or attempted rape in each case was accomplished by the 'use of force to the throat.' The commonality of this factor vanishes immediately upon analysis. Assuming that both cases being tried involved rape, we have no evidence that such purpose was accomplished by use of force to the throats of these unfortunate women. We only know that their deaths were commonly caused by a unique method. They were both garroted by use of a female stocking or pantyhose accompanied by use of the assailant's hand upon the neck fracturing the hyoid bone. Whether rape was attained by use of force at the throat or by threatened use of a revolver, knife, other weapon, or simple threats of physical assault to their person, is a matter of speculation.

[*Id.* at 503, 449 *A.*2d 1317.]

Some sources suggest a stricter standard for introducing evidence of an unrelated prior act to show a method of operation that can be used to establish identity. *See Frensley v. State,* 291 *Ark.* 268, 274, 724 *S.W.*2d 165 (1987) (citing Edward J. Imwinkelreid, *Uncharged Evidence,* § 3.10 to 3.12 (1984))[4]. Other courts have held that when the acts are comparable in several important ways, discrepancies go to the weight of the challenged evidence and not to its admissibility. 29 *Am.Jur.*2d *Evidence* § 423 (1994). One source notes that in these courts

[d]isparities are weighed evenhandedly against similarities, giving due measure to the number of each and to the distinctiveness of the attributes. Generally, when evidence of other acts is admitted, the comparison involves the conjunction of several identifying characteristics with the presence of some highly distinctive quality. The more distinctive the identifiers, the fewer of them need be present to demonstrate the requisite signature.

[4] Professor Imwinkelried states: "The courts and commentators have used various expressions to describe the requirement that the methodology be attributable to only one criminal: The methodology must be 'bizarre,' 'highly characteristic,' 'distinguishing,' 'distinctive,' 'dramatic(ally)' similar, an 'earmark,' 'exceptional,' a 'fingerprint,' a 'handiwork,' 'identifying,' 'idiosyncratic,' 'novel,' 'parallel,' 'peculiar,' 'remarkably similar,' 'set apart,' 'signature quality,' 'singular,' 'strikingly similar,' 'a veritable trademark,' 'uncommon,' 'unique,' or 'unusual.' " Professor Imwinkelried also includes, among the many examples given, some hypothetical examples that illustrate in his view the required standard of uniqueness: "the bandit with a silver crossbow," "criminals who repeat a particular humorous limerick or who wear the ceremonial headdress of an Indian chief," and a "robber wearing the medieval knight's helmet." [Imwinkelried, *supra* § 3.12 (1984) at 26–31 (footnotes omitted) ].

[*Ibid.* (citing *United States v. Ingraham,* 832 *F.*2d 229 (1 st Cir.1987)) (holding that evidence of previous threatening letters written by defendant was admissible in prosecution for making threatening telephone call in interstate commerce).]

█ We are satisfied that the standard for similarities in other-crimes evidence enunciated in *Sempsey* and later in *Reldan* continues to be appropriate. In order for evidence of a prior crime to be admissible on the issue of identity,

the prior criminal activity with which defendant is identified must be so nearly identical in method as to earmark the crime as defendant's handiwork. The conduct in question must be unusual and distinctive so as to be like a signature, and there must be proof of sufficient facts in both crimes to establish an unusual pattern.

[*Reldan,* 185 *N.J.Super.* at 502, 449 *A.*2d 1317 (citing *Sempsey,* 141 *N.J.Super.* at 323, 358 *A.*2d 212) ].

## V.

█ To state the law, however, is easier than to apply the law. The meaning of such words is not self-revealing. We are not so certain that the M.O. factors cited by Hazelwood, such as that both victims were mature females and were attacked while alone and at night time, demonstrate an "unusual pattern." (Defendant argues that there are sixteen differences between the crimes.) It is on this question of an "unusual pattern" that the testimony of Hazelwood would be helpful. For example, if the witness can from a reliable data base offer evidence that a combination of bite marks on the breast, bite marks on the chin, and rectal tearing inflicted during a sexual attack is unique in his experience of investigating sexual assault crimes, that evidence could help to establish an "unusual pattern." *See State v. Zola,* 112 *N.J.* 384, 548 *A.*2d 1022 (1988) (describing witness's compilation of database available for defendant to review); *see also,* James Alan Fox and Jack Levin, *Multiple Homicide: Patterns of Serial and Mass Murder,* 23 *Crime & Just.* 407, 435 (1998) (displaying incident characteristics—weapon use, victim-offender relationship, and circumstance—by homicide type in thousands of cases). Such expert testimony would help a court make an initial determination of

whether to admit the other-crime evidence and would, if presented at trial, better enable a jury to understand whether the crimes were "unusual and distinctive so as to be like a signature" such that an inference could be drawn to "earmark the crimes as the handiwork of the same person." It is initially for the court, and ultimately for the jury, however, to determine whether that inference concerning the ultimate issue of guilt may be drawn. *State v. J.Q.*, 130 *N.J.* 554, 556, 617 *A.*2d 1196 (1993). In point of fact, the trial court did incorporate Hazelwood's testimony in its 404(b) ruling, stating that Hazelwood's testimony was persuasive in that Hazelwood had not seen in reviewing 4000 cases this combination of bite marks, anal tears, and brutal facial beatings to a victim. If there is such a database of cases, the witness' premise can be fairly tested and the use of the testimony invokes none of the concerns that we have expressed about the improper use of expert testimony. We are especially concerned about the use of expert testimony "to interpret matters that could be considered commonplace or conduct that could be accounted for commonsensically." *Zola, supra,* 112 *N.J.* at 415, 548 *A.*2d 1022 (quoting Alan B. Handler, *The Judicial Pursuit of Knowledge,* Part I, 121 *N.J.L.J.* 882, 883 (May 5, 1988)). Our concern is that a factfinder's "uncritical acceptance of expert testimony can becloud the issues." *State v. R.W.,* 104 *N.J.* 14, 30, 514 *A.*2d 1287 (1986). We have no sense that Hazelwood's suggestions are counterintuitive or will receive uncritical acceptance. Stripped of its scientific mantra, the testimony is nothing more than a description of the physical circumstances present, somewhat similar to the description of the knots used to tie the victims in *State v. Code, supra,* 627 *So.*2d at 1382. We allowed similar testimony in *Zola, supra,* 112 *N.J.* at 414–16, 548 *A.*2d 1022, when the testimony involved "common sense" deductions on subjects about which jurors may not have much familiarity, and such testimony did not infringe on the jury's capacity to determine the ultimate fact at issue. Arguably at least, the questions here do not relate "to a subject-matter beyond the understanding of persons of ordinary experience, intelligence, and knowledge." *State v. R.W., supra,* 104 *N.J.* at 30,

514. *A*.2d 1287. Still we doubt that most jurors will have much familiarity with the pattern of injuries inflicted in rape cases.

## VI.

Finally, we repeat the importance of a carefully crafted limiting instruction that will explain to the jury the limited purpose for which the other-crimes evidence is being offered. In *State v. Stevens*, we explained that because "the inherently prejudicial nature of such evidence casts doubt on a jury's ability to follow even the most precise limiting instruction," 115 *N.J.* at 309, 558 *A*.2d 833, the court's instruction "should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." *Id.* at 304, 558 *A*.2d 833. We thus emphasized that a court should not state generally the content of *N.J.R.E.* 404(b) [then Evidence Rule 55], but should "state specifically the purposes for which the evidence may be considered and, to the extent necessary for the jury's understanding, the issues on which such evidence is not to be considered." *Id.* at 309, 558 *A*.2d 833. Hence, "more is required to sustain a ruling admitting such evidence than the incantation of the illustrative exceptions contained in the Rule." *Id.* at 305, 558 *A*.2d 833.

The practice in Illinois is to instruct the jury when other-crimes evidence is presented concerning the limited purpose for which it is offered. Steven A. Greenberg, *Evidence of Prior Misconduct— When Is It Admissible in a Criminal Case?*, 86 *Ill. B.J.* 694 (1998). In a case such as this, a court might initially state to the jurors when other-crime evidence is offered to prove identity:

Members of the Jury:

You are about to hear evidence presented by the State concerning a criminal act in Maine alleged by the State to have been committed by the defendant. I caution you that this evidence is not being offered to show that he is a bad person, but rather for a very limited purpose.

The purpose for offering this evidence is to attempt to convince you that the crime committed in Maine and the crime committed here are so similar and so

unique that you may infer that the same person committed the two crimes. In short, the evidence is being offered to prove the identity of the person who committed the crime in New Jersey on which you will deliberate.

If you find the two crimes not to be so similar as to warrant an inference that the same person committed them, then you must disregard the evidence entirely. Above all, you are not to infer that because the defendant may have been shown to have committed another crime elsewhere, that he is a bad man with a propensity for crime. Neither logic nor law permit that inference to be made.

Similar instructions should be included in the charge to the jury. (These are, of course, only suggested instructions. We request the Committee on Model Criminal Charges to recommend any needed changes in such a charge.)· With these conditions, we believe that a crime-scene analyst such as Hazelwood, with broad experience in investigating similar crimes, can assist a court and a jury in understanding whether the crimes bear such a unique signature that an inference may be drawn that the perpetrator of the two crimes was the same person.

The judgment of the Appellate Division is affirmed. The matter is remanded to the Law Division for further proceedings in accordance with this opinion.

LONG, J., concurring in part and dissenting in part.

*I*

On April 3, 1995, while Maine State Trooper Vicki Gardner was writing him a summons, defendant Steven R. Fortin attacked and sexually assaulted her, strangling her into unconsciousness. In the process, he battered her face, broke her nose, bit her neck and breast and inflicted anal injuries. Those are the facts that the State seeks to elicit under *N.J.R.E.* 404(b) to establish Fortin's identity as the murderer of Melissa Padilla in 1994. The majority today holds that, with a proper limiting instruction, such evidence can fairly be paraded before the jury that will try Fortin in this capital case. I respectfully disagree.

After it hears that evidence, which bears no unique signature to deflect a jury from its propensity use, it is inconceivable to me that a jury will be able to render an honest verdict as to whether

Fortin killed Melissa Padilla. That is not because the jurors are not sober and conscientious, but because they are human and, realistically, will be unable to abide by a limiting instruction.

We recognized that state of affairs in *State v. Brunson,* 132 *N.J.* 377, 391, 625 *A.*2d 1085 (1993), where we harked back to the concern we enunciated in *State v. Stevens,* 115 *N.J.* 289, 304, 558 *A.*2d 833 (1989), that a limiting instruction "may not cure the prejudice inherent in other crimes evidence admitted under Rule [404(b)]." [1] Based upon substantial and compelling legal scholarship, we held in *Brunson* that, even with a limiting instruction, the most dedicated juror cannot be trusted to use a similar prior conviction solely for impeachment purposes. We thus declared that, in those cases in which a testifying defendant has previously been convicted of a crime that is the same or similar to the pending charge, the State may impeach defendant only by reference to the date and degree of the prior offense without identifying the crime. *Id.* at 391–92, 625 *A.*2d 1085.

To be sure, there are differences between *N.J.R.E.* 404(b) uses and impeachment uses. For instance, the probative value of the former is judged greater than that of the latter, and impeachment may occur with sanitization while most *N.J.R.E.* 404(b) uses cannot take place without some of the details of the prior crime being revealed. Nevertheless, the potential for juror misuse is the same regardless of context, and all the concerns we expressed about the inadequacy of jury instructions in *Brunson* (which we decided after *State v. Cofield,* 127 *N.J.* 328, 605 *A.*2d 230 (1992)) exist and remain unresolved in a *N.J.R.E.* 404(b) proceeding.

There is simply no warrant to conclude that jurors who are so incapable of following the court's instructions in the impeachment context that the very name of the prior crime cannot be whispered in their presence, can use the particularly grotesque details of this crime solely for a limited *N.J.R.E.* 404(b) purpose.

---

[1] Former *Rule* 55.

That is not to suggest that evidence of every prior crime would so prejudice a defendant. For example, if testimony were adduced to show that a defendant's motive for murder was to cover up an embezzlement, the court could effectively instruct the jury not to use the embezzlement as an indication that defendant was predisposed to homicide. The reason that such an instruction would be effective is that it would not be counterintuitive.

On the contrary, it is this particular crime (the details of which are necessary to any identity analysis and cannot be satisfactorily sanitized) that makes it impossible for an effective instruction to be crafted. Indeed, the import of any instruction would necessarily be that the jury should not use the fact that Fortin beat, strangled, bit and sodomized Trooper Gardner to conclude either that he is a bad person or that he is likely to do so again. The reason that instruction would be ineffective is obvious: it flies in the face of human experience.

When the jury hears what Fortin did to Trooper Gardner, there exists a substantial risk that it will be lured into declaring his guilt on grounds other than the State's proof of each element of the New Jersey offense beyond a reasonable doubt; that it will punish Fortin for his "body of crime" as opposed to the murder of Melissa Padilla; or that it will convict him on a prophylactic basis—unsure of his guilt, but convinced that he is a danger to others based upon the Maine crime. In this capital murder case, I would not take that risk.

## II

It is well-established that *N.J.R.E.* 404(b) evidence should not be admitted where less inflammatory testimony is available on the issue. *State v. Oliver*, 133 *N.J.* 141, 151, 627 *A.*2d 144 (1993) (citing *Stevens, supra*, 115 *N.J.* at 301, 558 *A.*2d 833). Under that analysis, the details of Fortin's crime in Maine should have been excluded because there was other, less prejudicial evidence to link Fortin to the New Jersey crime. That evidence included testimony by Fortin's girlfriend that on the night of the murder, he

returned home with scratches on his head, neck and chest; testimony that Fortin's DNA was found on a cigarette butt near Melissa Padilla's body; and, most importantly, expert testimony of Dr. Lowell Levine, a forensic odontologist, concluding that the bite mark on Melissa Padilla's breast was made by Fortin and that the other bite marks on her body were consistent with Fortin's dentition. Prosecutors bring cases based on that quantum of evidence every single day. If believed by a jury, it would justify the conclusion that Fortin was the person who killed Melissa Padilla.

Here, the trial court essentially held that because the jury "could" disregard the State's expert and circumstantial evidence of identity, the highly inflammatory evidence of the Maine crime was admissible on that issue. Despite the deference that the judge is accorded, the fact that a jury might not be persuaded cannot possibly be the appropriate standard. If it were, it would open the door to the piling on of prejudicial and inflammatory other crimes evidence, contrary to *Oliver* and *Stevens,* in practically every case. Certainly, where, as here, there was non-inflammatory evidence sufficient to withstand a motion for judgment on the identity issue, there could be no legitimate reason to subject Fortin to the irremediable prejudice of the *N.J.R.E.* 404(b) evidence that clearly outweighed its probative value.

### III

Separate and apart from my overall objection to the admission of this evidence because it will nullify the possibility of a fair trial, I also disagree with the majority to the extent that it has concluded, as did the Appellate Division, that the Maine crime evidence is admissible in the absence of an expert.

There is a natural and inevitable tendency on the part of jurors to view proof of other crimes as justifying condemnation irrespective of the defendant's guilt of the present charge. 1 Wigmore Evid. § 194 at 646 (2 nd ed.1940). *N.J.R.E.* 404(b) recognizes that tendency by codifying New Jersey's long-standing exclusion of

prior crimes evidence to show predisposition, *State v. Kociolek,* 23 *N.J.* 400, 418–20, 129 *A.*2d 417 (1957), but allowing it to prove another fact in issue.

Because prior crimes evidence may simultaneously be highly probative and extremely prejudicial, *State v. Stevens, supra,* 115 *N.J.* at 300, 558 *A.*2d 833, a four-pronged test has been developed as a screen for the admission of such evidence. *State v. Cofield,* 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992). To be admitted, the other crime must be relevant to a fact in issue; similar and temporally proximate; committed by defendant; and more probative than prejudicial. *Ibid.* Although *Cofield* generally declares a similarity requirement, similarity is not essential except where identity is at issue.[2]

Although the admission of all prior crimes evidence is somewhat problematic, similar prior crimes evidence that is offered for identity poses the greatest threat to a fair trial because of the enhanced hazard of misuse. *State v. Reldan,* 185 *N.J.Super.* 494, 501, 449 *A.*2d 1317 (App.Div.), *certif. denied,* 91 *N.J.* 543, 453 *A.*2d 862 (1982). There is thus a higher standard for its admission. *United States v. Myers,* 550 *F.*2d 1036, 1045–46 (5 th Cir.1977), *cert. denied,* 439 *U.S.* 847, 99 *S.Ct.* 147, 58 *L.Ed.*2d 149 (1978). Such prior crimes must not only be similar, but must have been committed by a novel or extraordinary means. *Reldan, supra,* 185 *N.J.Super.* at 502–03, 449 *A.*2d 1317. In other words, two separate elements of proof are required:

[P]erhaps the most incisive statement of the theory appears in an English decision, *R. v. Morris.* In that 1970 case, Widgerly L.J. delivered the judgment of the Court of Appeal. In his opinion, his Lordship stated that to invoke this theory, the prosecutor must show that the charged and uncharged crimes were committed by "one and the same man." That expression connotes the two propositions the prosecutor must establish: (1) both crimes were committed with the "same" or strikingly similar methodology; and (2) the methodology is so unique that both crimes can be attributed to "one" criminal. The methodologies must resemble each other so closely that there is a reasonable deduction that the same person

---

[2] Many common scheme and plan cases will also involve similarity. *State v. Carswell,* 303 *N.J.Super.* 462, 470–71, 697 *A.*2d 171 (App.Div.1997).

committed the two crimes. The methodology must be peculiar; the methodology must "set apart" the perpetrator. The inference must be the identity of the perpetrator of the two crimes rather than one criminal's imitation of another criminal. The modus operandi must betray the defendant's personal criminal identity.

[1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* 3:10, 3:12 (1999).]

Similarity and uniqueness are distinct prongs of an identity analysis. Evidence should not be admitted for identity if one of the prongs is lacking. The brute number of similarities does not establish uniqueness. *Myers, supra,* 550 *F.*2d at 1045; *People v. Rivera,* 41 *Cal.*3d 388, 221 *Cal.Rptr.* 562, 710 *P.*2d 362, 364 (1985); 22 C. Wright & K. Graham, *Federal Practice & Procedure,* Evid. § 5246 (1978). Uniqueness depends on whether the characteristics of the crime are sufficiently idiosyncratic to permit an inference of pattern for the purposes of proof. 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 414[16] at 404–129–30 (1986).

The reason for the signature requirement is obvious: mere similarity only points to an interdicted use—predisposition. The unique signature is what upgrades the evidence and provides the jury with a basis to look beyond predisposition and fairly attribute both crimes to one criminal, thus establishing the valid *N.J.R.E.* 404(b) use of identity. Although rendering lip service to the duality of an identity analysis, the majority here has essentially collapsed the two prongs into one in ruling that an expert is permissible and not mandatory.

Even if a reasonable juror could conclude that the Maine and New Jersey crimes are similar based on the prosecutor's laundry list of fifteen gross similarities [3]—the question of uniqueness is

---

[3] Even the similarity prong is problematic as the Appellate Division noted:

Here there is an attempt to link behavior in two crimes under circumstances where there are as many differences as there are similarities, starting with the fact defendant was not charged with the attempted murder of Trooper Gardner. There are differences in the age, race, weight and height of the victims. There is a significant difference in the status of each victim. Trooper Gardner is a professional police officer and a potentially dangerous

much more complicated. This is not a case where two crimes were committed wearing medieval knights' helmets or masks of dead presidents. In such circumstances, a reasonable juror could easily parse out the uniqueness factor. Here, according to the prosecutor's theory (and Hazelwood), the signature behavior is the distribution of the bites; the anal and facial injuries; and manual frontal strangulation. Without a proper expert's opinion, there is simply no way for the jury to know what to make of these factors; more particularly, whether they are a handprint that sets Fortin apart as the perpetrator of both crimes, or whether they are merely meaningless permutations of most violent sex offenses.

Unlike similarity, as both the trial court and the Appellate Division held, this is not a matter within the ken of the ordinary juror. That that is so is underscored by the prosecutor's proffer of an expert in the first place. That proffer would surely not have occurred if, for example, both perpetrators had dressed the victims in bizarre clothing or left an amaryllis at the scene. Those examples are obvious signatures. There is nothing obvious about this case. In the absence of an expert, a jury simply cannot know whether a unique handprint is present. Without that proof, the evidence lacks the enhanced probative value necessary for an identity use. *Reldan, supra,* 185 *N.J.Super.* at 502–03, 449 *A.2d* 1317; *State v. Sempsey,* 141 *N.J.Super.* 317, 323, 358 *A.2d* 212 (App.Div.1976), *certif. denied,* 74 *N.J.* 272, 377 *A.2d* 677 (1977). On that basis, I would reject that portion of the Appellate Division's disposition admitting the Maine crime evidence in the absence of an expert.

That said, it is my view that the reliability defects that, according to the Appellate Division and the majority, preclude Hazel-

---

target for someone to perpetrate a crime against,particularly when defendant knew, prior to the assault, that his identity was made known to the state police dispatcher by Trooper Gardner. There are also differences in the type of assault. Trooper Gardner was anally and vaginally assaulted, while Padilla was assaulted anally, but not vaginally.

[*Fortin, supra,* 318 *N.J.Super.* at 577, 724 *A.2d* 818.]

wood from testifying as a scientific expert on linkage, are equally applicable to his proffer of uniqueness testimony. Linkage analysis is the procedure used by criminal investigators when the concentration of modus operandi and ritualistic characteristics in crimes is high, such that the investigator can conclude that the perpetrator is the same person. Uniqueness testimony is linkage analysis under another name. It is no more reliable when Hazelwood testifies as a crime investigator than when he does so as an "expert" in ritualistic behavior. In sum, while I would not allow the evidence of the Maine crime to be admitted without an expert, I agree with the Appellate Division that Hazelwood does not qualify.

## IV

I would reverse the determination of the Appellate Division that the details of the Maine crime are admissible under *N.J.R.E.* 404(b). Because the majority has determined that that evidence can be admitted, I would hold that an expert is necessary to establish uniqueness. I would affirm the Appellate Division's conclusion that Hazelwood does not qualify as such an expert.

*For affirmance and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN and VERNIERO—6.

*Concurring in part, dissenting in part*—Justice LONG—1.