185 N.J. Super. 494 (1982)
449 A.2d 1317
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT RELDAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 1982.
Decided May 11, 1982.
*495 Before Judges MICHELS, McELROY and J.H. COLEMAN.
Lois DeJulio, First Assistant Deputy Public Defender, argued the cause for appellant (Stanley C. Van Ness, Public Defender of New Jersey, attorney).
Catherine A. Foddai, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; James R. Zazzali, former Attorney General of New Jersey, and Catherine A. Foddai on the brief).
The opinion of the court was delivered by McELROY, J.A.D.
Defendant was indicted on January 20, 1977 for the murder of S.H. on October 6, 1975 (count one) and the murder of S.R. on October 14, 1975 (count two). The charges were tried together before a jury from May 21 through June 16, 1979 and resulted in a mistrial due to jury disagreement. A second trial of the charges was held from September 19, 1979 through October 17, 1979 and resulted in verdicts of guilty of second degree murder on count one and guilty of first degree murder on count two. *496 Defendant was sentenced to a mandatory term of life imprisonment for the latter conviction, consecutive to sentences already being served. A term of 30 years was imposed for the conviction under count one, consecutive to the sentence given for count two.
Defendant appeals, raising seven main points of error divided into ten sub-issues and arguments. The issue raised in defendant's first point, which challenges the trial judge's ruling permitting "other crimes" testimony (Evid.R. 55), obliges us to reverse and order a new trial. This required action obviates the need to discuss many of defendant's other points. Those issues requiring our further attention will be addressed in the latter part of this opinion. The facts relevant to the crimes for which defendant was tried and to the "other crimes" follow.
The two murders for which defendant was tried and convicted involved female victims. S.H. disappeared on October 6, 1975. She was last seen alive by her husband when he left their residence in Haworth the morning of that day. At about 1 p.m. he spoke to her by telephone. She was seen in her backyard by a neighbor during that afternoon. Mr. H. returned at about 5:50 p.m. and observed his wife's automobile in the garage. The keys to this vehicle were on the driver's seat as were a package addressed to Mrs. H's parents and a key to the house. The house was locked and there were no signs of struggle, disruption or theft. Her absence was unusual. Inquiry of neighbors and a search of the neighborhood failed to disclose her presence. H. notified the local police as to the circumstances.
On October 27, 1975 the body of S.H. was discovered in a wooded area of Valley Cottage, Rockland County, New York, a location about 15 miles removed from her residence. The body was nude, lying face down and covered with sticks and leaves. It was decomposed, with the skeleton exposed in the head and neck area. The face was mummified. Due to the state of decomposition and the action of animals, the buttocks and sexual organs were missing. A female stocking or pantyhose was *497 wrapped around the neck in the area of the fourth and fifth cervical vertebrae. A stick was entwined in the stocking, apparently to serve as a garrote.
Dr. Frederick Zugibe, Rockland County Medical Examiner, performed an autopsy. He found "fractures of thyroid cartilage and fracture of cornu of the hyoid bone of the neck." Dr. Zugibe determined the cause of death to be "asphyxiation due to ligature strangulation." At trial he opined that death was produced "by a rather unique technique because in addition to the garrote, which was the piece of wood in between the knot that could be twisted, [a] hand would have to be compressing against the neck at the same time." He explained that a fracture of the hyoid bone was common in manual strangulations and such a fracture indicated use of a hand as well as the garrote. The doctor estimated that death occurred about three weeks before the date the body was found.
S.R., the second victim, was single and employed as a receptionist in New York City. She resided in Demarest, New Jersey. On October 14, 1975 she left her place of employment at about 4:45 p.m. and was later observed exiting a bus at about 6:05 or 6:10 p.m. at County Road and Anderson Avenue in Demarest, the place from which she disappeared. This location was but a few blocks from her home. Her body was found on October 28, 1975 in Tallman State Park, Rockland County, New York, a point 12.9 miles from the place where S.H.'s body was discovered.
S.R. was found lying face up, nude, with a pantyhose ligature about her neck. There was evidence indicating that the body had been moved to this location after death. Dr. Zugibe performed the autopsy and estimated the time of death as about two weeks prior to discovery of the body on October 28, 1975. He determined that the cause of death was asphyxiation due to ligature strangulation. There was, as in the case of S.H., a fracture of the hyoid bone and the doctor concluded that this resulted from the use of manual force to the throat accompanied *498 by use of the stocking ligature. There was evidence of forced sexual penetration.
With respect to both victims Dr. Zugibe was of the opinion that the force used to turn the ligature was applied from the back of the neck and that the techniques used to fracture the hyoid bone were the same. It was his view that in both cases death was caused by ligature, assisted by the hand of the murderer.
Defendant had been convicted of a rape of one B.C. which occurred April 27, 1967 and of attempted robbery of B.M. on March 16, 1971. Although evidence of these crimes was not attempted to be used at the first trial, the State at the second trial proffered proof of them under Evid.R. 55 as going, among other things, to the question of identity of defendant as murderer of S.H. and S.R. Defendant's counsel objected to the proffer and an Evid.R. 8 hearing was held to determine the State's right to utilize, before the jury, the victims of these prior crimes and their testimony as to their experiences with defendant.
B.C. testified that on April 27, 1967, at about 3 p.m., she was alone in her home in Teaneck when defendant came to her door. He was holding a suit in a clear plastic bag, indicated he was from a dry cleaner and was trying to locate a family named Brantley. He asked to use B.C.'s telephone to call his store and check the address. She took him to a telephone in her den. He telephoned but indicated that no one answered. B.C. preceded him out of the room. As she did defendant placed his left arm tightly around her neck with his elbow directly under her chin. He pulled her backwards to a wall where, when she attempted resistance, he used his right hand to punch her in her back. Using his right hand he removed her undergarments and raped her. Defendant kept a tight hold on B.C.'s neck during the rape. He told her he had a gun and if she screamed he would kill her. Defendant asked if she had any money. When she replied that she only had ten dollars in her pocket he did not *499 further pursue that inquiry. Defendant, having accomplished his purpose, ordered B.C. to go into the bathroom and remain there until he left. She did so and later called the police.
B.M. testified that on March 16, 1971, at about 8 p.m., she drove into her garage at a multiple garden apartment complex in Metuchen. Her garage was a single unit in a group of ten. Suddenly the driver's door was opened and a knife was placed at her throat. She identified defendant as the man who did so. She was told to be quiet or she would be hurt. Defendant entered her car and told her he wanted money. Her pocketbook was between them and she told defendant to "take everything." Defendant paused and then turned out the headlights. She stated that "when he kept pushing, after he turned out the headlights, I felt I knew what he wanted." B.M. kept sliding over to the passenger side of the car, unlocked the door and pushed it open. During this time defendant had his hand over her face "so that I was completely muzzled and choked at the same time." B.M., with the assistance of a court officer, demonstrated for the court using her left hand, a grip described by the court as follows:
THE COURT: Ring finger and index finger to either side of the nose covering the ends, either end of the mouth.
The thumb and little finger under the chin at the throat a few inches below each ear and at a point approximately where the Adam's apple is or just a little above it.
The witness indicated that she really could not recall which hand defendant used. The following day she thought her nose was broken and she could not move her neck. As defendant held her face in this manner, the knife was held in front of her. She tried to scream but breathing was obviously difficult with defendant's hand over her mouth and forcibly around her nose.
The incident was brief. She apparently not only struggled but managed some noise as well because defendant threatened that if she didn't stop "screaming and yelling and ... fighting" he was going to have to "harm" her or "kill" her. She managed to go out through the passenger's door but she could not *500 remember how she did so. Once out of the car she stood by it "and screamed [her] lungs out." Defendant left the car and walked slowly away, turning once to look at her. Defendant did not take her purse. On cross-examination B.M. stated that "around the time of the last trial here in Bergen County" she had demonstrated to the prosecutor the method by which defendant had placed his hand over her face and throat. As previously noted, B.M. was not called as a witness at defendant's first trial, nor did B.C. testify.
The trial judge ruled that the testimony of B.C. and B.M. was admissible under Evid.R. 55, but only on the issue of identity. In doing so the judge reviewed at length the testimony of both witnesses, the evidence of Dr. Zugibe as to the cause of death of S.H. and S.R., and the facts of their disappearances previously noted in this opinion. He concluded that the known facts of all four crimes displayed but one common element, a use of some degree of force to the throat of all four victims. He then determined:
This Court must decide if, under the circumstances here present, that one element is sufficient to justify the testimony concerning attacks made by the Defendant in March of '67 and April 1971 or either of them.
I am faced with the question, is the use of force to the throat of a potential rape victim so unusual and distinctive as to be like a signature?
In determining the answer to that question, in arriving at the conclusion which has been reached, this Court has studied and reflected upon all the cases cited by both the State and the Defendant, which has totaled approximately sixty, most of which cases involve sexual assault of some kind.
In addition, the Court over the years has read other decisions involving some type of sexual assault, has presided over some trials of such cases and as an attorney, had occasion to represent some persons charged with some type of sex crime.
In none of the cases cited by either side nor does the Court ever recall reading or being aware of any case involving forced sexual activity where there was evidence of force exerted against the victim's throat to achieve submission.
The use of a weapon, whether a gun or knife, punches, threats of bodily harm in a menacing tone, putting the victim in fear is common, but never has this Court heard or seen strangulation or the use of force applied to the throat as a means of obtaining submission of a potential rape victim.
Indeed the use of force to the throat of a person is rare in any type of crime. Because of that, it is concluded that such method is unique and tantamount to a *501 signature, so that it qualified under the exception contained in Rule 55 as probative of the issue of identity only.
The testimony of B.C. and B.M. before the jury substantially followed that given at the Evid.R. 8 hearing and the judge gave the jury the required limiting instruction. Evid.R. 6.

I
Evid.R. 55, "Other Crimes or Civil Wrongs," provides:
Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.
Interpretation of this rule is not without precedents. In State v. Inman, 140 N.J. Super. 510 (App.Div. 1976) we noted:
Admission of evidence of prior conduct on this theory requires more than testimony of repeated crimes of the same class, such as burglaries, thefts, or attempts at theft. The conduct in question or the criminal scheme or device used "must be so unusual and distinctive as to be like a signature." McCormick on Evidence 2 ed. 1972), § 190 at 449.[1]
[1] The admissibility of evidence of the commission of prior similar criminal acts as relevant on the issue of identity has been most frequently raised in cases involving rape or sexual offenses. The courts generally require proof of sufficient facts to establish an unusual pattern or modus operandi as a condition precedent to admission. For examples see Nester v. State, 75 Nev. 41, 334 P.2d 524 (Sup.Ct. 1959); State v. Francis, 91 Ariz. 219, 371 P.2d 97 (Sup.Ct. 1962); Mosley v. State, 211 Ga. 611, 87 S.E.2d 314 (Sup.Ct. 1955), and Harris v. State, 189 Tenn. 635, 227 S.W.2d 8 (Sup.Ct. 1950); cf. State v. Smith, 84 N.J. Super. 452 (App.Div.), certif. den. 43 N.J. 270 (1964). [140 N.J. Super. at 516]
In Inman we further observed:
The admissibility of such evidence is generally limited to those situations where "a crime has been committed by some novel or extraordinary means or in a peculiar or unusual manner," and there is proof of recent similar acts or crimes by the accused committed by the same means or in the same manner. 22A C.J.S., Criminal Law § 684 at 759 (1961); 1 Underhill's Criminal Evidence (6 ed. 1973), § 210 at 632; cf. State v. Harris, 105 N.J. Super. 319, 322 (App.Div. 1969); State v. Hector, 19 Ohio St.2d 167, 249 N.E.2d 912, 918 (Sup.Ct. 1969). [140 N.J. Super. at 517]
The risk of prejudice attendant to the admission of evidence of prior crimes is apparent. Wigmore notes that there is a *502 "natural and inevitable" tendency on the part of jurors to view proof of other crimes "as justifying a condemnation irrespective of guilt of the present charge." 1 Wigmore, Evidence (2 ed. 1940), § 194 at 646. In the same vein, we observed in State v. Sempsey, 141 N.J. Super. 317 (App.Div. 1976), certif. den. 74 N.J. 272-3 (1977):
It is well-recognized that the "average individual is prone to much more readily believe that a person is guilty of the crime charged if it is proved to his satisfaction that the defendant has committed a similar crime." State v. Hector, 19 Ohio St.2d 167, 249 N.E.2d 912, 916 (Sup.Ct. 1969); State v. Harris, 105 N.J. Super. 319 (App.Div. 1969). "When other crime evidence is admitted a jury might tend to think of defendant as a bad person in general and thereby convict him * * * for that reason alone." State v. Wright, 132 N.J. Super. 130, 142 (App.Div. 1974), rev'd 66 N.J. 466, and dissenting opinion adopted. Such evidence has a high potential for prejudice and it is only admissible if it is relevant, tends to prove some fact in issue and "is not received simply to show the general disposition of the defendant to commit crime." State v. Wright, supra 132 N.J. Super. at 148. [141 N.J. Super. at 322-323].
Because of the great hazard of prejudice, particularly where the venture is to prove identity, it has been said that "proffered other crimes evidence must meet a stiffer standard than is generally required when the evidence is offered to prove other issues." N.J. Rules of Evidence (Anno. 1980), Comment 9 to Evid.R. 55. Equally, in United States v. Myers, 550 F.2d 1036, 1045-1046 (5 Cir.1977), cert. den. 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978), the court noted:
A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind. E. Cleary, McCormick on Evidence § 170, p. 452 (rev. ed. 1972). Compare United States v. Goodwin, 492 F.2d [1141] at 1154, with United States v. Shadletsky, 491 F.2d 677, 678 (5th Cir.1974). We have consistently held that for evidence of other crimes to be admissible the inference of identity flowing from it must be extremely strong. In United States v. Goodwin, supra, for example, we said that evidence of a prior crime was inadmissible to prove identity because the two crimes did not "bear such peculiar, unique, or bizarre similarities as to mark them as the handiwork of the same individual." 492 F.2d 1154. [at 1045-1046]
The law in this State is of similar view. In Sempsey, supra, we held:
In order for evidence of a prior crime to be admissible on the issue of identity (for which it was offered here) the prior criminal activity with which defendant *503 is identified must be so nearly identical in method as to earmark the crime as defendant's handiwork. The conduct in question must be unusual and distinctive so as to be like a signature. McCormick on Evidence (2 ed. 1972), § 190 at 449, and there must be proof of sufficient facts in both crimes to establish an unusual pattern. [141 N.J. Super. at 323]
We cannot agree with the trial judge's apparent conclusion that the known facts of the cases here tried and those of B.C. and B.M. track each other, are so nearly identical in method as to earmark the crimes tried as defendant's handiwork, or that the assailant's conduct in all four instances was so unusual and distinctive as to constitute a signature.
The common factor relied on was an assumption by the court that rape or attempted rape in each case was accomplished by "the use of force to the throat." The commonality of this factor vanishes immediately upon analysis. Assuming that both cases being tried involved rape, we have no evidence that such purpose was accomplished by use of force to the throats of these unfortunate women. We only know that their deaths were commonly caused by an unique method. They were both garroted by use of a female stocking or pantyhose accompanied by use of the assailant's hand upon the neck fracturing the hyoid bone. Whether rape was attained by use of force at the throat or by threatened use of a revolver, knife other weapon, or simple threats of physical assault to their person, is a matter of speculation. The matter presented might be of different quality had the assaults upon B.C. and B.M. been accomplished, or attempted, by use of some sort of garrote or ligature. In such situation one area of conjecture would, at least, be removed and such use of force might be considered so "distinctive so as to be like a signature." Sempsey, supra at 323. We cannot, however, agree with the trial judge that use of force to a victim's throat is so unique as to indicate particular, peculiar and individual handiwork.
Moreover, the two instances sought to be employed to establish defendant's identity were themselves dissimilar. In the rape of B.C. defendant used the crook of his left arm from a *504 position behind his victim to subdue her and accomplish his purpose. In the assault upon B.M. one of defendant's hands was used to hold a knife. The other placed in such manner as to (perhaps) close off her nose with a finger on each side. His palm was over her mouth (apparently to prevent her screams) and the pressure applied to her throat (which may have been merely coincidental) was by means of his "thumb and little finger under the chin at the throat a few inches below each ear at a point approximately where the Adam's apple is or just a little above it." This does not suggest a determined effort to overcome the victim by choking her. It appears to us that the manner of "the use of force to the throat" in each case was, perhaps, in a generic sense similar but individually not of the quality which would rise to the level of a distinction equivalent to a signature. One cannot avoid the thought that neither of these incidents present sufficient "earmarks" to justify the employment of one in an Evid.R. 55 attempt to prove identity in the other case. We need not decide that point; we are convinced these other crimes had no place in the trial below and that the admission of this evidence before the jury requires reversal.
The State urges that at worst the admission of this evidence was harmless because there was ample evidence of defendant's guilt. The evidence against defendant was largely circumstantial and was apparently of such quality at the first trial, without the evidence of the assaults on B.C. and B.M., to lead the trial judge to submit the matter to the jury. The evidence given at the second trial, with the testimony of B.C. and B.M. excised, was of the same degree but the State's characterization of it as "ample" is too subjective a view of the matter. The ultimate question is not whether the State made out a case; rather we must consider "whether there was a real possibility, one sufficient to raise a reasonable doubt as to whether the error led the jury to an unjust result." State v. Macon, 57 N.J. 325, 335-336 *505 (1971). We are so convinced and beyond a reasonable doubt. The intrusion of the evidence of these prior crimes into this trial clearly had the high potential for prejudice recognized in our cases and basic to the exclusionary pronouncement of Rule 55. The unnecessary insinuation of this material into the State's case cannot, in the circumstances presented, be regarded as anything less than "of such nature as to have been clearly capable of producing an unjust result." R. 2:10-2. We cannot view the error harmless when, as here, the potential for prejudice in having two women describe defendant's brutal rape and assumed attempted rape is so obvious. We are thus compelled to reverse.
We note, before passing on to the other issues, that the trial judge's decision lacked an important consideration. Admissibility of prior crimes evidence that properly qualifies under Evid.R. 55 frequently leads to another question, i.e., whether such admissible evidence should, nevertheless, be excluded in the process of balancing its demonstrated admissibility "against the counter considerations expressed in R. 4 of undue consumption of time, confusion of the issues and the misleading of the jury." State v. Garfole, 76 N.J. 445, 451 (1978). The factual complex here presented called for an exercise of judicial discretion in this respect. We acknowledge that the evidence given by B.C. and B.M. was not unduly time-consuming but, in a proper case, and here, because the judge viewed this evidence as qualified under Evid.R. 55, a recorded statement of a trial judge's view of the other Evid.R. 4 grounds for exclusion would be of assistance to a reviewing court.

II
Defendant in his second point contends that the trial judge erred in denying his motion for severance of the cases of S.H. and S.R. With respect to this issue we affirm substantially for the reasons expressed by Judge Madden in his decision on *506 defendant's motion for severance. State v. Reldan, 167 N.J. Super. 595 (Law Div. 1979).

III
In his third point defendant contends:
THE TRIAL COURT ERRED IN FAILING TO DISMISS THE INDICTMENT FOR LACK OF JURISDICTION IN NEW JERSEY, OR IN THE ALTERNATIVE, IN REFUSING TO SUBMIT THIS FACTUAL ISSUE TO THE JURY.
A. The Trial Court Improperly Denied Defendant's Motions to Dismiss The Indictment For Lack of Jurisdiction.
B. The Trial Court's Refusal To Instruct The Jury On The Issue Of Jurisdiction Was Erroneous And Denied Defendant His Constitutional Right To A Trial By Jury On All Questions Of Fact.
Our examination of the record presented leads to the conclusion that these contentions are clearly without merit. R. 2:11-3(e)(2). The evidence presented below and the inferences reasonably to be drawn therefrom presented sufficient ground to confer jurisdiction to the State of New Jersey. The question of jurisdiction is not one for the jury. See Adair v. United States, 391 A.2d 288 (D.C.App. 1978). The decision rendered by the trial judge, which appears State v. Reynolds, at 166 N.J. Super. 570 (Law Div. 1979), is therefore affirmed.

IV
Defendant's assertions in points four and six, as to whether the jury was impartial and the alleged excessiveness of his sentence, are rendered moot by our disposition of this matter. The plain error point raised in point five, as to "speedy trial," need not be considered. It does not rise to the required level. R. 2:10-2. The issue raised in point seven as to the witness Lozier, raised as a plain error point, we decline to consider. R. 2:10-2.
For the reasons heretofore expressed the judgment entered in the trial court is reversed and the matter is remanded for a new trial.