**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2404-23

ROBERT RELDAN,

  Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

  Respondent.

_____

   Argued March 5, 2025 – Decided March 26, 2025

   Before Judges Sabatino, Gummer, and Jacobs.

   On appeal from the New Jersey State Parole Board.

   Raymond M. Brown argued the cause for appellant (Pashman Stein Walder Hayden, PC, attorneys; Raymond M. Brown, of counsel and on the brief; Dillon J. McGuire, on the brief).

   Eric M. Intriago, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Eric M. Intriago, on the brief).

PER CURIAM

Robert Reldan is an eighty-four-year-old State inmate who is serving a life sentence with a consecutive 30-year custodial term for two murders he committed in 1975, plus other sentences on additional convictions.  He appeals the Parole Board's February 28, 2024 final agency decision that denied him parole and set a future eligibility term ("FET") of 36 months.

Appellant chiefly contends the Parole Board's decision did not fairly consider the probative import of two psychological evaluations declaring him as having only a "low to moderate" present risk of re-offense.  The decision erroneously refers twice to the risk assessments as "moderate" and incorrectly treats them as an aggravating factor.

Appellant further argues the Parole Board's stated reasons were conclusory in several respects.  He asserts the Parole Board failed to give sufficient weight to several mitigating factors, including his infraction-free conduct in prison since 2009, his extensive participation in counseling and institutional programs, and his advanced age and poor health.  In addition, he contends the Parole Board gave undue weight to the severity of the criminal acts he committed five decades ago, which the passage of time and expressions of remorse can never alter.

A-2404-23

Giving due regard to the Parole Board's authority and expertise, we nevertheless remand this matter and direct the agency to reconsider its decision. In particular, we instruct the Parole Board to correct its mistaken interpretation of the expert risk assessments and accordingly re-calibrate its overall weighing of the pertinent factors. On remand, the Parole Board also must consider and discuss explicitly and give fair weight to all of the mitigating factors appellant has highlighted, to the extent those factors were either overlooked or mentioned in the decision in a conclusory manner without analysis.

## I.

Reldan was convicted of two murders he had committed in 1975 and other serious crimes, including conspiracy to murder a relative, assaulting a sheriff's officer with tear gas, escape, robbery, and an attempted second escape. The murders involved garroting the female victims.

Before the murders, Reldan had an extensive criminal history, with ten adult convictions that included a 1967 rape and seven juvenile adjudications. He was classified as a habitual offender.

A-2404-23

The trial court sentenced Reldan to a life sentence for one murder and a consecutive 30-year sentence for the other murder. The convictions and sentences were affirmed on appeal and in subsequent proceedings.[1]

Reldan's Institutional History

During his four decades of incarceration, Reldan has committed 22 or more institutional disciplinary infractions, including eight "asterisked" (i.e., more serious) offenses.[2] It is undisputed that his most recent infractions—which concerned refusing to work or to accept a program or housing unit assignment and tattooing or self-mutilation—occurred over fifteen years ago in July 2009.

In recent years Reldan reportedly has been a compliant inmate. He has taken part extensively in anti-violence and educational programming, counseling for over 30 years with a chaplain and other prison staff. After

---

[1] For the purposes of this opinion, we need not detail the facts of these violent crimes, which have been described in our previous opinions. State v. Reldan, 373 N.J. Super. 396 (App. Div. 2004); State v. Reldan, 185 N.J. Super. 494 (App. Div. 1982). We also incorporate by reference our descriptions of the offenses set forth in our previous parole opinions. Reldan v. N.J. State Parole Bd., No. A-0265-18 (App. Div. Dec. 4, 2019); Reldan v. N.J. State Parole Bd., No. A-1786-13 (App. Div. Apr. 24, 2015); Reldan v. N.J. State Parole Bd., No. A-6039-10 (App. Div. July 9, 2012).

[2] The record supplied on this appeal varies as to the exact number of infractions and asterisked offenses.

receiving a substantial inheritance from a relative, he paid $10 million to the family of one of his victims. He continues to receive $50,000 annually from the inheritance, which could provide him a means of support if he were paroled.[3]

Recent Risk Assessments: "Low to Moderate"

Reldan has been the subject of a series of pre-parole risk assessments, in which his risk score has periodically reduced over time. The two most recent risk assessments, as supplied to the Parole Board in the present case, are as follows.

In May 2018, an expert with a Ph.D. in clinical psychology whom Reldan had retained independently ("appellant's expert") conducted a psychological evaluation and risk assessment of him. The evaluation included three sessions spanning approximately eight hours. Among other things, that expert considered Reldan's offense history, his personal circumstances, his insight into his criminal conduct, and the administration of various psychological tests.

Appellant's expert concluded, to a reasonable degree of psychological certainty, that if Reldan were granted release on parole "no future problems with [his] risk management . . . were identified as likely to occur." As to the specific

---

[3] We note this continued stream of assured income lessens an expectation that Reldan is likely to reoffend for monetary gain.

A-2404-23

degree of risk he poses, the expert opined in her written report:

> Reldan's current and foreseeable risk of engaging in violent behavior, including sexually violent behavior, were he to be granted parole, is in the <u>low to moderate range</u>.
>
> [(Emphasis added).]

The expert amplified that conclusion in the following sentences of her report, explaining the components of that risk assessment range:

> <u>The factors underlying [the] moderate [component of the] level of risk are almost exclusively historical factors, which will not change no matter how long[] []Reldan remains incarcerated</u>. Factors associated with <u>[the] lower [component of the] estimate of risk</u> included his present age—recidivism base rates for both violence and sexual violence tend to go down with increasing age—as well [as] a number of protective factors: absence of major mental disorder; absence of substance abuse; presence of insight; presence of psychological support; feasible plans for potential release to the community; and resources to secure housing.
>
> [(Emphases added).]

In addition, appellant's expert opined that "based upon [her] 30 years of experience in conducting forensic evaluations of criminal offenders," Reldan had a "clear capacity for remorse and empathy." The expert "respectfully disagree[d] with the [Parole Board's] assessment that he fails to demonstrate insight, and [its view] that 'nothing has changed in inmate Reldan despite being

6

incarcerated for over 40 years.'"

By comparison, the most recent risk assessment of Reldan was performed in November 2022 by an expert commissioned by the Parole Board, who likewise has a Ph.D. in psychology ("the Parole Board's expert"). That expert had previously evaluated Reldan in 2011 and again in 2017. The expert's assessment similarly included Reldan's offense history, his personal circumstances, his insight into his criminal conduct, and the results of various psychological tests.

The Parole Board's expert's findings substantially, albeit not completely, aligned with those of appellant's expert. Based on Reldan's Level of Service Inventory-Revised ("LSI-R") score of 17, the Parole Board's expert agreed with appellant's expert that Reldan presented a "low to moderate" risk of reoffending if placed on parole.[4] The Parole Board's expert did not comment, however, about

---

[4] The Federal Probation Journal, published by the Administrative Office of the United States Courts, explains that a LSI-R score of 17 should be considered in the low to moderate range:

> The LSI-R is a standardized actuarial instrument that contains 54 items and produces a summary risk score that can be categorized into five risk levels. Based on the Multi Health Systems (MHS) cutoff scores, ranges have been designated that indicate an individual's risk category. Specifically, the risk categories are: 1) Low, which ranges from a 0 to 13 overall risk score; 2)

the enduring impact of Reldan's criminal history—which will not change—upon his LSI-R score despite the length of his incarceration.[5] The record reflects that Reldan's LSI-R score has declined, as documented in this record, from a previous score of 23 to the present 17.

The Parole Board's expert acknowledged that at the time of her November 2022 assessment, Reldan is "now over fifty years old (82) which is usually commensurate with decreased impulsivity, reactivity and likely lessened criminality." The expert added that "it should be pointed out that [given Reldan's] lack of recent violence and current age, [there is a] diminished risk for further violence." The expert further observed that, although Reldan's "[e]arlier institutional adjustment was clearly problematic," currently his adjustment "is

---

Low/Moderate, which ranges from 14 to 23 overall risk score; 3) Moderate, which ranges from 24 to 33 overall risk score; 4) Moderate/High, which ranges from 34-40 overall risk score; and 5) High, which ranges from 41 to 54.

[Christopher T. Lowenkamp & Kristin Bechtel, The Predictive Validity of the LSI-R on a Sample of Offenders Drawn from the Records of the Iowa Department of Corrections Data Management System, 71 Federal Probation Journal, 34, 35 (2007).]

[5] We note that 9 of the 17 points within Reldan's LSI-R score are attributable to his "criminal history" and 4 additional points are correspond to other historical facts that cannot be altered.

now satisfactory and [his] programming accomplishments appear reasonable."

As a caveat, the Parole Board's expert cautioned that "[w]hile [Reldan] has been infraction free since 2009, his refusal to consider [a] more congregate setting and exposure to other interpersonal dealings consistent with such an opportunity, makes it difficult to have any degree of confidence in considering him for parole release."

As to the question of Reldan's likelihood of violence if paroled, the Parole Board's expert recognized that "actual violent behavior [by Reldan] has not been demonstrated in four decades." The expert opined that Reldan "appears to be a low to moderate risk for future violence but [the] extent and severity of past violent offenses cannot be overlooked." (Emphasis added).

Addressing Reldan's readiness for parole, the Parole Board's expert opined that "[t]he likelihood of this inmate successfully completing a projected term of parole is fair due to constellation of risks and strengths as previously discussed." (Emphasis added).

Health Status

Reldan indisputably suffers from multiple health conditions. They include: legal blindness in one eye, cataracts that require surgery in the other eye; arthritis in both knees and both hips requiring surgery; hearing impairment;

and a hyperplasia prostate condition. The Parole Board's decision acknowledges these conditions, with the exceptions of providing no commentary on Reldan's cataracts or hearing impairment. The parties acknowledge that Reldan's medical condition has not yet declined to a degree that he is eligible for consideration under the Compassionate Release Act, N.J.S.A. 30:4-123.51e. State v. Payne, 259 N.J. 452 (2025) (applying the terms of that statute).

Previous Parole Board Decisions and Appeals

Reldan first became eligible for parole in July 2008. The Parole Board denied his initial parole application and imposed a 240-month FET. We reversed that decision on appeal and remanded for the Parole Board to establish a shorter FET and articulate the basis for it. Reldan v. N.J. State Parole Bd., No. A-6039-10 (App. Div. July 9, 2012).[6] On remand, the Parole Board reduced the FET term by twelve months, leading to another appeal and an opinion of this court in 2015, in which we again reversed and remanded for a new parole hearing. Reldan v. N.J. State Parole Bd., No. A-1786-13 (App. Div. Apr. 24, 2015).

_____

[6] Similar to his present appeal, Reldan argued the Parole Board had improperly focused too much on his criminal history and had not fairly considered his risk assessment, the multiple letters of support submitted on his behalf, nor his participation in institutional programs. Id. at 4.

The next parole hearing resulted in denial of parole and a 120-month FET. Reldan appealed that decision, which we affirmed in 2019. Reldan v. N.J. State Parole Bd., No. A-0265-18 (App. Div. Dec. 4, 2019). We recognized that, by that point, Reldan had "made some progress" and his LSI-R score had improved to 19. Id. at 5. Nevertheless, we ruled the Parole Board had ample grounds to deny parole and impose the 120-month FET. Id. at 6.

The Present Case

The steps that led to the parole decision currently on appeal began in January 2023, when Reldan's application was processed and sent to a two-member Board Panel. In March 2023, the Board Panel referred the case for hearing by the full Parole Board.[7]

On May 15, 2023, Reldan appeared with counsel before the full Parole Board for his hearing. The hearing was apparently recorded, but the recording was not transcribed for the appeal.

Following the hearing, the panel issued a one-page Notice of Decision that day, denying parole and imposing a 36-month FET. The Notice of Decision contained a three-sentence explanation, noting in part that "[c]oncerns remain

_____

[7] The details regarding that March 23, 2023 two-member Board Panel hearing have not been supplied to us, other than copies of the hearing determination and a letter to Reldan about that determination.

that Reldan does not accurately understand the thought process that motivate[s] him to [commit] criminal behavior for monetary reasons for other reasons, and how he thinks and acts upon [sic] when committing crimes."

The reasons for denial reflected via a checklist in the May 2023 Notice of Decision included: facts and circumstances of the offense; prior offense record is extensive; offense record is repetitive; prior offense record noted; nature of criminal record increasingly more serious; committed to incarceration for multiple offenses; prior opportunity on probation and parole and incarceration failed to deter criminal behavior; committed new offenses on parole; commission of current offense while incarcerated; and insufficient problem resolution, specifically his "lack of insight into criminal behavior" and "minimiz[ing] conduct" as demonstrated by his interview, pre-parole report, documentation in case file, and professional reports. In addition, the Parole Board noted as an aggravating factor Reldan's risk assessment evaluation.[8]

---

[8] In an April 10, 2023 letter from the Parole Board, a representative advised Reldan that his risk assessment had been removed as a mitigating factor and recast as an aggravating factor. When Reldan responded to the letter to inquire how a "low to moderate" risk was an aggravating factor, he was informed that his LSI-R score of 17 shows a "moderate" risk and thus is correctly considered an aggravating factor. As we discuss, infra, the "moderate" characterization was mistaken, as was the conversion of the risk assessment from a mitigating factor to an aggravating factor.

A-2404-23

Meanwhile, the Parole Board in May 2023 deemed applicable the following mitigating factors: infraction-free since last panel hearing; participation in programs specific to behavior; institutional reports reflect a favorable institutional adjustment; attempted participation in programs for which he was not admitted; commutation time restored; and a letter of support from his sister.

In October 2023, Reldan filed an administrative appeal with the full Parole Board. He asserted the Parole Board had failed to consider significant mitigating evidence, including his age, letters of support, and institutional programming. He argued the Parole Board had not met its burden to establish a substantial likelihood of future criminal conduct, especially in light of the dual "low to moderate" risk assessments.

In its February 28, 2024 final agency decision ("Final Decision"), accompanied by a form checklist, the full Parole Board amended its initial May 2023 determination to include "participation in institutional programs" as a mitigating factor, but it otherwise reaffirmed the denial of parole and its adoption of a 36-month FET.

In its six-page Final Decision, the Parole Board recounted the seriousness of the facts underlying the murder convictions, restated the list of aggravating

and mitigating factors mentioned above, and reiterated its concern that Reldan lacks insight into his criminal behavior. The Parole Board rejected Reldan's contentions that it had failed to consider any pertinent facts, noting the facts were within Reldan's institutional record and had been discussed in the hearing and thus considered.

Specifically as to Reldan's age, in the Final Decision the Parole Board simply noted his age was "a matter of record." The Parole Board acknowledged that Reldan had discussed research studies that showed recidivism reduces with advanced age. Even so, the Parole Board stated that ultimately "age is not dispositive of whether the offender is suitable for parole release."

Regarding the six letters of support, the Parole Board stated that although only one letter was listed as a mitigating factor in the May 2023 decision, it had discussed the remaining letters with Reldan at his hearing and considered them. The Parole Board clarified that its treatment of his sister's letter as a mitigating factor "should not be interpreted as a failure to have given due consideration to other letters of support."

Although Reldan contended that the Parole Board had reused the same "50-year-old, unchangeable, immutable evidence" in denying him parole, the Parole Board noted that the Parole Act of 1979 permits it to consider the entire

record at each parole consideration and to cite the same reasons for parole denial at each time of parole consideration.

The Parole Board acknowledged in its Final Decision that it had considered the risk assessments by the two experts who had evaluated Reldan. Notably, on the second and fourth pages of the decision, the Parole Board erroneously states twice that Reldan's LSI-R score of 17 indicates a "<u>moderate risk</u>" of recidivism. (Emphasis added). Also, the Parole Board stated that the risk assessment score was appropriately utilized as an aggravating factor. These erroneous statements contrast with other passages within the Final Decision that refer to the risk assessments as evidencing only a low to moderate risk. These discrepancies are unexplained.

Reldan's present appeal followed.[9] Fundamentally, he argues the Parole Board's denial is arbitrary and capricious and that it overlooks or gives short shrift to important factors in his favor. He contends the Parole Board is determined to deny him parole indefinitely and have him die in prison. He urges that we reverse the Parole Board and order his release. In the alternative, his

---

[9] By way of update, in supplemental correspondence provided at our request, counsel have advised us that Reldan appeared in January 2025 at another parole hearing before a two-member panel. According to counsel, the panel again denied parole and that Reldan's deadline to file an administrative appeal of that newest decision is ninety days from January 27, 2025.

brief requested a remand[10] to have the Parole Board reevaluate "significant mitigative evidence" it had ignored in its Final Decision.

## II.

### A.

Preliminarily, we note it is undisputed that the applicable statutory standards of parole for Reldan, given the pre-1997 dates of his offenses, are those codified in the Parole Act of 1979, L. 1979, c. 441, N.J.S.A. 30:4-123.45 to .69 (1979).[11] Critically, under the Act, inmates are entitled to a presumption of release on their parole eligibility date unless the Parole Board establishes, by a preponderance of the evidence, that the inmate presents a substantial likelihood of reoffending if released. N.J.S.A. 30:4-123.53 (1979); see Acoli v. N.J. State Parole Bd., 250 N.J. 431, 456 (2022). "The language of the [1979] . . . Act 'creates a protected expectation of parole in inmates who are eligible for parole.'" Id. at 456 (quoting N.J. State Parole Bd. v. Byrne, 93 N.J. 192, 206 (1983)).

---

[10] At oral argument Reldan's counsel withdrew his alternative request for a remand. Of course, that does not deprive this court of the authority to order such a remedy.

[11] The two homicides were committed before significant revisions to the Act were adopted in 1997. See L. 1997, c. 213.

The Parole Board must consider the factors enumerated in the applicable regulations, N.J.A.C. 10A:71-3.11(b)(1)-(23), in making its decision. Those factors include, but are not limited to: the facts and circumstances of the offense; the inmate's mental and emotional health; statements of the inmate reflecting on whether there is a likelihood he will commit another crime; offenses and disciplinary infractions committed while incarcerated; participation in institutional programs and academic or vocational education programs; parole plans; the failure to rehabilitate; and the statement or testimony of victims.

The Parole Board is not required in each case to consider every factor stated in the regulations; rather, it should consider and weigh the factors applicable to the context. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 561 (App. Div. 2002).

Although the "[f]acts and circumstances of the offense" is one factor the Parole Board may consider, N.J.A.C. 10A:71-3.11(b)(5), the gravity of the offense cannot serve as "an independent reason for continuing punishment and denying parole" under the 1979 Act. In re Parole Application of Trantino ("Trantino II"), 89 N.J. 347, 373–74 (1982).

B.

Our scope of review of the Parole Board's decision is guided by case law, most recently explained by our Supreme Court in Acoli, 250 N.J. at 454–55, and by this court in Berta v. New Jersey State Parole Board, 473 N.J. Super. 284 (App. Div. 2022).

As described by the Supreme Court in the majority opinion in Acoli:

> Parole determinations are entitled to deferential review by our courts. A mere difference of opinion is not a basis for a court to overturn a parole decision.
>
> The discretionary power exercised by the Parole Board, however, is not unlimited or absolute. A government agency, such as the Parole Board, may not wield its discretionary power arbitrarily. Like all agency decisions, those rendered by the Parole Board are subject to judicial review. However deferential the standard of review may be, our courts are the ultimate arbiters of whether the Board has acted within the bounds of the law.
>
> [250 N.J. at 454–55.]

In that same vein, the Court has long recognized that the Parole Board "'has broad but not unlimited discretionary powers,' and its determinations are always judicially reviewable for arbitrariness." Trantino v. N.J. State Parole Bd. ("Trantino VI"), 166 N.J. 113, 173 (2001) (quoting Monks v. N.J. State Parole Bd., 58 N.J. 238, 242 (1971)).

18                                                                    A-2404-23

We are mindful our role is not to substitute our judgment for the Parole Board with respect to denial of parole or the setting of an FET. N.J. State Parole Bd. v. Cestari, 224 N.J. Super. 534, 547 (App. Div. 1988). Unless the Parole Board's decision is found to be "arbitrary, capricious, or unreasonable, or not supported by substantial credible evidence in the record as a whole," it shall not be disturbed. In re Stallworth, 208 N.J. 182, 194 (2011) (alteration omitted); see Trantino v. N.J. State Parole Bd. ("Trantino IV"), 154 N.J. 19, 24 (1998); McGowan, 347 N.J. Super. at 563.

That said, "[t]o a greater degree than is the case with other administrative agencies, the Parole Board's decision-making function involves individualized discretionary appraisals." Ibid. We give due regard to the caution expressed by the dissenting justices in Acoli that "[o]ur only role is to ensure that the Parole Board does not abuse its discretion in making its decisions." 250 N.J. at 479–80. The judiciary's function "is not about [considering] how we, as [appellate jurists], would have assessed the facts as members of the Parole Board. Our sole task is to determine whether the Parole Board abused its discretion under a very lenient standard of review." Id. at 483.

We applied these principles of appellate review in reversing and remanding the Parole Board's denial of parole in Berta. In that case, the Parole

Board denied parole principally because: (1) Berta was "committed to incarceration for multiple offenses"; (2) he has a "serious" and "persistent" history of institutional disciplinary infractions; and (3) his continued denial of guilt constitutes "insufficient problem resolution." Berta, 473 N.J. Super. at 289. We reversed and remanded for the Parole Board to reconsider its decision, and held that "if the Parole Board on remand determines that Berta should not be released, it must thoroughly explain the reasons for overcoming the presumption of parole and for imposing an FET beyond the twenty-seven-month presumptive FET." Id. at 290.

We explained in Berta that

> the [Parole] Board shoulders the burden to explain why Berta's refusal to acknowledge his guilt foreshadows that he will commit a future crime. It is not enough for the Board to state a conclusion. Rather, the Board must explain how it reached its conclusion that Berta is substantially likely to reoffend. This explanation is especially necessary in light of the two in-depth psychological evaluations that suggest, to the contrary, that Berta presents only a low risk of re-offense.
>
> . . . .
>
> [E]ven accepting that "insufficient problem resolution" or "negative thinking" can be a relevant consideration, our principal concern in this case is that the Board has not explained why Berta's refusal to acknowledge his guilt translates into a substantial likelihood that he would re-offend. The Board's analysis is superficial

and conclusory. While we acknowledge the Board's expertise in addressing inherently subjective questions, we need not defer to what is tantamount to a "net" opinion, that is, one that does not explain the basis for the conclusion. The fact that the assessment of an inmate's negative attitudes and problem resolution is inherently subjective does not exempt that assessment from meaningful appellate review. Nor does the deferential nature of our review excuse the Board from explaining why its subjective assessment supports the ultimate conclusion that there is a substantial likelihood that the inmate will reoffend.

[Id. at 290, 319 (emphases added) (citations omitted).]

We additionally noted that the Parole Board failed to adequately consider how Berta's age affected its decision. Consequently, we instructed the Parole Board on remand "to account specifically for Berta's age, along with all relevant mitigating circumstances, in determining whether—and, if need be, explaining why—the preponderance of the evidence establishes a substantial likelihood that he will re-offend." Id. at 322.

C.

Applying these principles of appellate oversight, we are constrained to set aside the Parole Board's final agency decision in this matter for several reasons. Although the Final Decision spans six pages, it has multiple shortcomings that support Reldan's contention that, as written, it is arbitrary, capricious, and unreasonable.

21

First and foremost, the Parole Board's consideration of Reldan's risk of reoffense, as measured and agreed upon by both examining experts, is flawed. We are especially concerned that the Parole Board erroneously stated twice that Reldan's risk of reoffense was "moderate" rather than, as the two experts each stated, "low to moderate." We cannot ascribe this fundamental mistake to a minor typographical or proofreading error. The qualitative difference between low to moderate and moderate is not inconsequential.[12] Indeed, this misclassification caused what should be a mitigating factor to be treated as an aggravating one. See Acoli, 250 N.J. at 469 (finding that the "low-to-moderate-risk assessment concerning the likelihood of Acoli's recidivism [did] not equate to a substantial likelihood of committing a crime").

We recognize that the Final Decision in other passages states the low to moderate rating correctly. But these crucial mistakes undermine our confidence in the Parole Board's analysis.

Moreover, the decision does not discuss the downward historical trend of Reldan's LSI-R score from 23 to 17. Nor does the decision respond to Reldan's contention that his score is permanently affected by an offense history from five

_____

[12] An LSI-R score of 17 corresponds to a low to moderate risk of recidivism. Lowenkamp & Bechtel, supra note 4, at 35.

decades ago that he cannot change.

Second, the decision fails to address sufficiently the research studies, which the Court cited to in Acoli, regarding the impact of Reldan's advanced age as an octogenarian. Id. at 469–70. As Justice Albin in Acoli underscored:

> Studies have shown that as individuals age, their propensity to commit crime decreases and, in particular, that elderly individuals released from prison tend to recidivate at extremely low rates. See generally Nat'l Rsch. Council, The Growth of Incarceration in the United States: Exploring Causes and Consequences 155 (Jeremy Travis, Bruce Western & Steve Radburn eds., 2014) ("[R]ecidivism rates decline markedly with age."); see also U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 3 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (finding that that"[o]lder offenders were substantially less likely than younger offenders to recidivate following release"); N.J. Dep't of Corrections, State Parole Bd., Juv. Just. Comm'n, Release Outcome 2007: A Three-Year Follow-Up 15 ("Multivariate statistics indicated that age was inversely related to the odds of rearrest; for every one-year increase in age, the offender's odds of a new arrest decreased by a factor of .95.").

> Significantly, inmates released at age sixty-five or older had only a 6.5 percent rate of incurring a new conviction and only a 4.1 percent rate of reincarceration. U.S. Sent'g Comm'n at 23. Acoli is in an advanced age group for which there is not a comparable statistical cohort. Suffice it to say, a 4.1 percent rate of reincarceration—without regard to any other factors that might militate toward denying

23

parole—can hardly equate to a substantial likelihood of reoffending.

[Ibid.]

In the present case, the Parole Board merely acknowledged Reldan's advanced age and his reference to such studies about the age-crime curve, but essentially brushed it aside by declaring it "not dispositive." We agree with the Parole Board that age is not a dispositive factor that is outcome-determinative of parole. But the Parole Board in its Final Decision did not explain why and how an 84-year-old half-blind man with arthritic knees and hips, impaired hearing, and a hyperplastic prostate poses a substantial likelihood of committing a crime if he were released. Simply acknowledging a mitigating consideration without substantively analyzing it does not fulfill the agency's responsibilities. Berta, 473 N.J. Super. at 290.

Third, the Final Decision says little about Reldan's positive rehabilitative accomplishments within the institution over the course of his confinement. Merely listing the programs Reldan participated in and the letters of support he received, and noting those items were considered, gives this court no insight into how they were considered.

By contrast, the Parole Board in the Final Decision emphasized the severity of the crimes Reldan had committed in 1975. To be sure, the atrocity

24

of the murders and Reldan's other offenses must never be forgotten. But, just as advanced age should not be dispositive in granting parole, an applicant's offense history should not be dispositive in denying it. As we have noted above, the Supreme Court has instructed that "the gravity of the crime" cannot serve as "an independent reason for continuing punishment and denying parole" under the 1979 Act. Trantino II, 89 N.J. at 373–74.

We recognize the Parole Board's observations about Reldan's demeanor when he was questioned at his hearing and its associated findings that Reldan displays "insufficient problem resolution," "lacks insight into his criminal behavior," and "minimizes his conduct."[13] The record, however, reflects that Reldan has expressed remorse for, and an understanding of, his crimes.

In fact, the Parole Board specifically found that Reldan has conveyed "repeated expressions of deep regret for his actions, which he recognizes as wrong" but goes on to say that those expressions of remorse do "not equate to a change in his behavior." To support that conclusion, the Parole Board hearkens back to Reldan's "deeply rooted" criminal behavior, "as evidenced by his

---

[13] We note these phrases, or their linguistic equivalents, mirror those the Parole Board utilized in denying parole to Berta. Berta, 473 N.J. Super. at 289. We do not suggest that they are inappropriate terms or observations, but they must be analytically substantiated by the individual record in a parole case and not serve as formulaic boilerplate.

extensive and <u>increasingly more serious</u> criminal record." (Emphasis added). These historical references concern a series of offenses Reldan committed in the late-1970s and is not supported by newer information. Indeed, it is countered by Reldan's infraction-free disciplinary record for the past fifteen years.

D.

On the whole, the Final Decision, as written, has too many omissions, conclusory assertions, inconsistencies, and shortcomings to satisfy the statutory criteria for denying parole. The Final Decision suffers from many of the infirmities similar to those we identified in <u>Berta</u>.

Although we too recognize the atrocity of Reldan's lethal and violent offenses from the 1970s and the agency's expertise and customary wide zone of discretion, we are constrained to remand this matter once again to the Parole Board for reconsideration.

On remand, the Parole Board shall address the many concerns stated within this opinion and in Reldan's appellate briefs and issue a new determination within ninety days. Although we leave the denial of parole undisturbed in the interim, the 36-month FET is vacated, without prejudice.[14]

---

[14] We defer to the Parole Board's administrative discretion as to whether, following input to the agency from Reldan or his counsel, it would be more efficient to combine the remand in some manner with an administrative appeal

A-2404-23

Vacated and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

---

Reldan may file with the Parole Board of the two-member panel's January 2025 decision.  If such a combined proceeding is pursued, the 90-day remand deadline we have prescribed is relaxed, provided that the parties proceed expeditiously.